**James D. MEAD, Plaintiff,**

**v.**

**Sherwood Andrew SCHAUB a/k/a Andrew Sherwood, Stanley C. Johnson, Richard A. Miners, Marguerite Bischoff and Robert S. Van Dyke, Executors of the Estate of Charles Bischoff, Goodrich & Sherwood Company, a partnership, and William J. Strizever, Defendants.**

**No. 89 Civ. 8354(MEL).**

United States District Court, S.D. New York.

March 1, 1991.

---

Scharf & Zeno, P.C., New York City, for plaintiff; Fred E. Scharf, Mark W. Zeno, of counsel.

Solomon & Fornari, P.C., New York City, for defendants; Richard M. Zuckerman, Jacob Inwald, of counsel.

LASKER, District Judge.

James D. Mead, a former employee of G & S Corp. ("G & S"), alleges that G & S, together with five individuals who are or were employed there (collectively "defendants") fraudulently induced him to accept employment with G & S in order to capture his client bases, all allegedly in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982). Mead sues under § 1964(c), for injuries allegedly sustained by reason of violations of § 1962(a), (b), (c) and (d).

Defendants move to dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted and for failure to adequately plead fraud.

## I. BACKGROUND

Mead alleges that, between July 1982 and June 1985, defendant Stanley Johnson, then a partner and principal owner of G & S, induced him to leave his old employment in California to accept a position as a management consultant with G & S in New York. Commencing in June 1985, Mead worked at G & S first as an employee and later as a partner until his withdrawal in December 1987, at which time he started his own management consulting business in the New York metropolitan area.

Mead maintains that defendants promised him numerous benefits, including advanced training in specialized search fields, a position as manager of a branch office to be established in California, substantial commissions, the right, as a partner, of access to the books and records of G & S, and complete participation in all phases of

management of G & S—representations that Mead claims they knew to be false but made in the hope of recruiting him. Mead alleges that these and other instances of fraudulent misrepresentations, and fraudulent concealment of material facts were effected by "regular and frequent use of the United States mails as well as interstate telephone facilities, resulting in the commission of acts indictable under 18 U.S.C. Section 1341 (relating to mail fraud) and 18 U.S.C. Section 1343 (relating to wire fraud)." Complaint at ¶ 110. Each of these communications is alleged to have been made in furtherance of defendants' scheme to defraud Mead in order to secure his client bases.

According to Mead, after he commenced his employment at G & S, in or about the latter part of June 1985, defendants [1] furnished him with a draft of a written employment agreement which, after certain unspecified changes were made therein, Mead executed on June 24, 1985. The agreement provided for an annual salary of $125,000 plus forty-five percent of gross revenue for business Mead worked on or generated from management consulting. Mead maintains that he exceeded the production goals set by defendants, but despite this "unsurpassed performance," defendants failed to keep their promises. G & S did not provide Mead with advanced search training (in fact, no such program existed at G & S) and it failed to support the opening and development of a branch office in California, representations which Mead relied on as conditions to his accepting G & S's offer of employment. Moreover, G & S failed to pay any part of $187,500 due Mead for additional compensation and reimbursable business expenses.

Mead charges that defendants (1) induced him to defer receipt of sums due him as an employee, (2) fraudulently induced him to become a partner of G & S, (3) misrepresented the nature of the Partnership Agreement with G & S, (4) unlawfully and fraudulently falsified and manipulated G & S's books and records, and (5) fraudulently interfered with and misappropriated developed relationships Mead had established while at G & S and prior to that time.

Further, Mead alleges that when Stanley Johnson offered him a position as a management consultant, he represented that G & S's limited non-competition agreement with its employees was a mere formality, which had never been enforced against a departed employee and would never be enforced against Mead should his employment be terminated in the future. Moreover, as part of the Partnership Agreement, he asserts that he later requested and received a release from this restrictive covenant. *See* Exhibit "B".[2] As it turned out, G & S did not abide by this commitment; after Mead's departure from G & S, defendants sued Mead around July, 1989, seeking damages for Mead's alleged failure to pay an outstanding debt on a Note granted by the partnership and for his alleged breach of the restrictive covenant, presumably engendered when Mead started his own practice in the New York area.[3]

---

1. Where individual defendants are named they will be so identified.

2. Exhibit "B" provided in part:
   "You have expressed the concern that Section 12.05 of the Agreement prohibits you from going to work for any competitor of G & S. There is no such prohibition in the Agreement. Furthermore, the Agreement should not be read to preclude you from going to work for any management consulting firm which has clients similar to G & S."

3. In the related state court action, *Sherwood v. Mead*, No. 20666/89 (N.Y.Sup.Ct. Sept. 3, 1990), Mead pleaded claims of fraudulent misrepresentation as affirmative defenses to Andrew Sherwood's claim on the partnership note executed by Mead. In granting plaintiff Sherwood's motion for partial summary judgment on his claim, the State Supreme Court found that "the purported misrepresentations seem[ed] vague and fail[ed] to rebut the promissory note." *Id.* at 4. Mead is therefore collaterally estopped by the State Supreme Court's decision from raising and relitigating here in the context of the RICO claim the issue of misrepresentation upon the partnership note. Nevertheless, Mead's other causes of action in the case at bar, such as the alleged misrepresentations surrounding the enforcement of the restrictive covenant, were not the subjects of the state court's ruling and appear to be based upon a different set of facts, so that collateral estoppel does not apply to them.

## II. RULE 9(b)

■ Defendants argue that the complaint must be dismissed because its claims fail to plead a RICO violation with the particularity required by Federal Rule of Civil Procedure 9(b).[4] Although it is not necessary to reach this argument, since as indicated below the complaint is found to be insufficient on other grounds, it may be noted that, although the complaint does specify the role some of the multiple defendants named in the complaint played in the alleged scheme to defraud Mead, it falls short of alleging that each defendant personally agreed to commit two or more predicate acts of mail or wire fraud. *See United States v. Boylan*, 898 F.2d 230, 242 (1st Cir.1990) (elements of a conspiracy must be linked in such a way as to afford a plausible basis for the inference that an agreement existed). As stated in *U.S. v. Bonanno Organized Crime Family*, 683 F.Supp. 1411, 1441 (E.D.N.Y.1988),

> In the Second Circuit, a required element of a RICO conspiracy is that the defendant himself have agreed to commit two or more predicate acts. Although the Amended Complaint has alleged the commission of two or more predicate acts by some, but not all, defendants, the commission of the acts is distinct from an agreement to commit them, and a violation of § 1962(d) requires different proof from a violation of § 1962(c). The RICO conspiracy claim in the instant action is insufficient because it does not allege an agreement by each defendant to commit two predicate acts. [citations omitted]

Furthermore, Rule 9(b) ostensibly rebukes using the convenience of discovery to find a basis for and to justify an action against multiple defendants for which there is no basis for alleging a conspiracy based on fraud. *Thornock v. Kinderhill Corp.*, 712 F.Supp. 1123, 1129 (S.D.N.Y.1989).

## III. RICO

■ To state a viable RICO claim, a plaintiff must allege that the defendants committed two or more predicate acts within a ten year period and that such acts constituted a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In *Sedima* the Supreme Court emphasized that "the definition of a 'pattern of racketeering activity' differs from the other provisions in § 1961 in that it states that a pattern '*requires* at least two acts of racketeering activity,' Section 1961(5) (emphasis added), not that it 'means' two such acts. The implication is that while two acts are necessary, they may not be sufficient." *Id.* at 496, n. 14, 105 S.Ct. at 3285, n. 14. In this regard, what is required is a showing that the predicate acts were related and amounted to, or threatened the likelihood of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, ——, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195, 208 (1989). As noted by the Court in *Sedima*, " '[i]t is this factor of *continuity plus relationship* which combines to produce a pattern.' " 473 U.S. at 483, n. 4, 105 S.Ct. at 3278, n. 4 (quoting S.Rep. No. 91–617, p. 158 (1969) (emphasis added)). Defendants contend that Mead has not adequately alleged a "pattern of racketeering activity" within the meaning of §§ 1961(5) and (1) because he has failed to satisfy its "continuity" requirement.

The Supreme Court has recently defined a threat of continuing racketeering as either repeated conduct over a determinate period of time, or past conduct "that by its nature projects into the future with a threat of repetition." *H.J., Inc., supra*, 492 U.S. at ——, 109 S.Ct. at 2902, 106 L.Ed.2d at 209. Struggling over what activities constitute a threat of continuity to establish a RICO pattern, the Court stated:

> The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particu-

---

**4.** Rule 9(b) requires that: "[I]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."

lar case a "pattern of racketeering activity" exists.

*H.J. Northwestern,* 492 U.S. at ——, 109 S.Ct. at 2902, 106 L.Ed.2d at 210. The Court noted, for example, that "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business ... or where it is shown that the predicates are a regular way of ... conducting or participating in an ongoing and legitimate RICO 'enterprise.' " *Id.*

Although a basis for inferring that the predicate acts are related can be the nature of the enterprise, as, for example, where the racketeering acts are performed at the behest of an organized crime group, *U.S. v. Indelicato,* 865 F.2d 1370, 1383–84 (2d Cir.) (*en banc*), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989), the nature of the enterprise is not always sufficient to establish a threat of continuity. *See, e.g. Beauford v. Helmsley,* 865 F.2d 1386, 1391 (2d Cir.1989) ("When ... there is no indication that the enterprise whose affairs are said to be conducted through racketeering acts is associated with organized crime, the nature of the enterprise does not of itself suggest that racketeering acts will continue, and proof of continuity or the threat of continuity of racketeering activity must be thus found in some factor other than the enterprise itself."). A critical factor in determining whether the predicates are "continuing" under RICO is the terminable quality of the goal or purpose of the enterprise.

In *Cullen v. Paine,* 689 F.Supp. 269 (S.D. N.Y.1988), for example, this court dismissed a RICO complaint that alleged fraud in the recruitment of stockbrokers. There, as in the present case, it was alleged that the defendants embarked on a scheme to recruit the plaintiffs in an effort to capture their client bases. Noting that the alleged enterprise had a "clear terminating goal"—to secure such client bases—this court held that such goal was effectively accomplished when the plaintiffs' employment was terminated. *Cullen,* 689 F.Supp. at 274.

In the case at bar, there is no allegation of mob-relatedness, as there was in *Indelicato.* There is also nothing to suggest that the "enterprise", G & S Corp., is in the business of or depends on the commission of acts of mail and wire fraud by its employees in the conduct of its day to day affairs. Each of the fraudulent communications is alleged to have been made only in furtherance of defendants' scheme, embarked upon in 1982, to recruit Mead in order to capture his client bases. Complaint ¶ 26. As in *Cullen,* the alleged enterprise here had a clear terminating goal; once Mead left G & S in 1987, this goal was effectively accomplished.

The requirement of continuity might have been satisfied in this case if the predicates "*themselves* amount[ed] to ... *continuing* racketeering activity." *H.J. Northwestern,* 492 U.S. at ——, 109 S.Ct. at 2901, 106 L.Ed.2d at 208 (emphasis added). But Mead would have us say that the acts alleged demonstrate continuing racketeering activity simply because they spanned a period of years.

To the extent that the goal of the alleged scheme in this case was to deprive Mead of his client bases, each alleged act constitutes nothing more than a step towards its accomplishment. Although the alleged scheme to defraud Mead may have required a number of steps over a determinate period of time, nevertheless because of its terminable nature and single goal it does not meet the requirement of continuity. *See Cullen,* 689 F.Supp. at 269.[5]

In sum, proof of the purpose and nature of the alleged RICO enterprise, when com-

---

**5.** We do not find persuasive plaintiff's argument that, as to the restrictive covenant, the continuing effect of the alleged fraud is critical in determining whether the racketeering activity is continuing. *Cullen,* 689 F.Supp. at 275, n. 10. Nor do we subscribe to the argument that, as to "other actual or prospective employees and 'partners' of defendant G & S," G & S's continu-

ing business renders the racketeering activity ongoing. As we have noted, "There is ... nothing to suggest that G & S Corp. depends on the commission of acts of mail and wire fraud by its employees in the conduct of its day to day affairs." *Supra* text. We have no reason to believe otherwise.

bined with the character of the offenses charged in the present case, does not satisfy the requirement of continuity because it fails to establish ongoing racketeering activity, either in the past or for the future. Accordingly, the complaint is dismissed.

It is so ordered.