**William BARRETT, Plaintiff,**

v.

**UNITED STATES BANKNOTE CORPORATION and Christie, Manson & Woods International, Inc., Defendants.**

**No. 91 Civ. 7420 (RPP).**

United States District Court,
S.D. New York.

Oct. 7, 1992.

Sacks Montgomery, P.C. by Scott D. St. Marie, New York City, for plaintiff.

Weil, Gotshal & Manges by Jeffrey S. Klein, New York City, for defendant U.S. Banknote Corp.

Hughes Hubbard & Reed by Norman C. Kleinberg, New York City, for defendant Christie, Manson & Woods, Int.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiff moves to file an amended complaint based on evidence discovered since the filing of the original complaint. For the reasons set forth below, Plaintiff's motion is granted in part and denied in part.

## BACKGROUND

Plaintiff William Barrett is a Canadian citizen and president of William Barrett Numismatics Limited ("Barrett Numismatics"), a corporation organized and existing under Canadian law. Defendant United States Banknote ("USBN") is a New York corporation and parent of American Bank Note Company ("ABN"), which is engaged in the business of printing currency, stocks, bonds, food stamps, and postage stamps. Defendant Christie, Manson & Woods International ("Christie's") is a New York corporation that conducts public auctions of works of art.

Central to Plaintiff's claim is an auction held at Christie's on November 28 and 29, 1990 ("November auction"), at which items from ABN's archives—including old and rare bank notes, stamps, and specimen stocks and bonds—were sold. According to Plaintiff, the Defendants represented that they possessed no other banknotes that were similar to or duplicates of the banknotes offered for sale. At the November auction, Plaintiff submitted successful bids which Christie's accepted as agent for USBN. On June 5, 1991, Christie's held another auction ("June auction"), which involved the sale by USBN of additional items from the ABN archives. Plaintiff claims that the items sold at the June auction were similar to or duplicates of his purchases.

On October 1, 1991, Plaintiff filed a complaint alleging breach of contract and breach of warranty against USBN and alleging intentional misrepresentation against Christie's. Plaintiff based his claims upon alleged misrepresentations made by Defendants concerning the nature and uniqueness of the notes he purchased in the November auction. Specifically, Plaintiff claimed that Defendants knew or should have known "that substantial duplication existed between banknotes from the ABN archives to be auctioned in the November sale and banknotes from the ABN archives to be auctioned in the future sale...." Compl. ¶ 40. Defendants filed answers on December 20, 1991.

After discovery had commenced, Defendants moved to file a counterclaim asserting antitrust claims based on newly discovered evidence. Thereafter, on April 23, 1992, Plaintiff moved for leave to amend the complaint in order to add the following claims: (1) a violation of the RICO statute, 18 U.S.C. §§ 1961, 1962(a)–(c) and a claim

for damages under 18 U.S.C. § 1964(c); and (2) a punitive damages claim to the fraud cause of action asserted against Defendants. Plaintiff also moved to add as named individual defendants Lamb, Pope and Kreitman, the three individuals from Christie's and USBN who participated in the alleged fraudulent schemes.

*The Allegations of the RICO Complaint*

On February 28, 1990, USBN and Christie's, through Stanley Kreitman, president of USBN, and Elizabeth Pope, an employee of Christie's, reached agreement to auction the ABN archives. In the contract USBN warranted that USBN owned the ABN archives to be consigned to the auction. Christie's, through Pope and James Lamb, another employee at Christie's, advertised the auction in articles and press releases mailed or wired to prospective collectors and bidders. As part of this advertising campaign, an interview with Lamb appeared in June 1990 in the *Banknote Reporter*, a widely circulated newspaper for collectors and dealers in paper currency. In the interview Lamb stated that "[a]ll the issues of one bank will be put in together, not necessarily in one lot, but in a small number of lots.... We're not going to play the game of cutting up sheets or leaking things out over 20 years or selling parts off privately." Am.Compl. ¶ 57.

In August 1990, Kreitman, to limit speculation about the future availability of the banknotes to be auctioned at the November auction, represented that printing plates possessed by USBN which might be used to print further banknotes would not be used in the future. The representation stated that USBN could "assure prospective buyers that the lots in this sale represent all the existing archival material and that those printing plates which still exist will remain the property of [USBN]. No further impressions will be made from these plates for commercial purposes." *Id.* ¶ 63. In September 1990, Lamb mailed Kreitman's representation to Barrett in response to questions Barrett had asked regarding the banknotes to be sold at the November auction. Christie's also printed the representation in its catalogue for the

November auction ("November catalogue") and mailed the catalogue to collectors, dealers and other prospective bidders. The proposed RICO complaint further alleges that Lamb and Pope published falsely low price estimates of the USBN banknotes in the November catalogue in order to induce prospective purchasers to attend the auction.

On November 15, 1990, two weeks prior to the November auction, Christie's and USBN were informed by attorneys for the Bank of Canada that numerous lots of Canadian materials included in the November catalogue were not in fact owned by USBN, but rather were owned by the Canadian government. As a result, Christie's and USBN "agreed to withdraw 21 lots in their entirety, and portions of 22 other lots, and return the withdrawn materials to the Bank of Canada." *Id.* ¶ 74. Christie's and USBN subsequently published an addendum to the November auction catalogue which stated that "Christie's ... agreed to a private sale arrangement between [USBN] and the Bank of Canada affecting a small number of lots in this sale." *Id.* ¶ 75. The addendum was mailed to Plaintiff and other prospective bidders at the November auction, and the information contained in the addendum was also relayed to bidders by phone. Plaintiff attended the November auction and submitted successful bids totalling $1,582,405.

Christie's also included in its November sale catalogue 95 proofs or specimens of banknotes issued by the Bank of Israel which were in fact not owned by USBN but owned by the Bank of Israel. Prior to the June auction, however, Christie's and USBN were advised that the Bank of Israel owned materials scheduled to be sold at the June auction. Christie's and USBN subsequently agreed to withdraw the challenged lots from the June auction. *Id.* ¶¶ 83–84. Plaintiff alleges that, despite this agreement, at the June auction Defendants sold, "in contravention of the Bank of Israel's ownership," nineteen proofs and specimens owned by the Bank of Israel, *id.* ¶ 84, and that there was "substantial duplication in the June sale of banknotes included in the November sale." *Id.* ¶ 87. The amended

complaint states that the duplication contradicted Kreitman's representation published in the November catalogue. *Id.* Furthermore, the RICO allegations state that the June auction included proofs and specimens of banknotes not owned by USBN but consigned by foreign governments to USBN.

The RICO allegations go on to state that, in September 1991, USBN, without Christie's as its agent or intermediary, sold a further part of its ABN archives to Nemco, a brokerage firm. The archives sold to Nemco included proofs and specimens of banknotes, as well as proofs and specimens owned by the governments of Canada and Israel. Plaintiff alleges that some of the banknotes sold by USBN to Nemco during this period duplicated banknotes sold to Plaintiff at the November auction.

Plaintiff's final factual allegation is that, on March 27, 1992, USBN caused to be filed with the United States Securities and Exchange Commission a registration statement under the Securities Act of 1933 stating that "[t]hrough [Christie's], ABN sold at public auction in 1990 and 1991 certain ... [ABN] materials, consisting of proofs and specimens of postage stamps and banknotes for approximately $10.2 million and $1.9 million, respectively.... From time to time, the Company may sell its other remaining materials from its archives...." Am.Compl. ¶ 92.

## DISCUSSION

Fed.R.Civ.P. 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Leave to amend a pleading should be granted if the movant "has at least colorable grounds for relief," absent any undue delay, bad faith, or undue prejudice to the opposing party. *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Building 1 Housing Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979).

Leave to amend will not be granted under Rule 15(a), however, where there are no colorable grounds for the proposed claim—that is, where amendment would prove futile. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222

(1962). The "colorable grounds" requirement mandates "an inquiry—comparable to that required by Fed.R.Civ.P. 12(b)(6) ...— as to whether the proposed amendments state a cognizable claim...." *CBS, Inc. v. Ahern*, 108 F.R.D. 14, 18 (S.D.N.Y.1985) (citation omitted). In sum, amendment is futile if a proposed claim could not withstand a motion to dismiss made pursuant to Fed.R.Civ.P. 12(b)(6). *S.S. Silberblatt*, 608 F.2d at 42; *CBS*, 108 F.R.D. at 18. A claim will be dismissed pursuant to Fed. R.Civ.P. 12(b)(6) where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see Rapf v. Suffolk County of New York*, 755 F.2d 282, 290 (2d Cir.1985).

In determining whether a pleading should be dismissed for failure to state a claim, the court must accept the allegations in the complaint as true and construe all allegations in favor of the pleader. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). "It follows, then, that denial of a motion to amend based upon the asserted inadequacy of the proposed pleading is disfavored." *CBS*, 108 F.R.D. at 19; *see Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1366 (2d Cir.1985), *aff'd*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

### The Validity of the RICO Claims

To state a claim for damages under section 1964(c) of the RICO statute, a plaintiff must first allege a violation of the substantive RICO statute, 18 U.S.C. § 1962(a)–(c). Under § 1962(a)–(c), a plaintiff must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d

Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

■ The pattern requirement involves two elements. The plaintiff must show that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989); *Landy v. Heller, White & Co.*, 783 F.Supp. 125, 131 (S.D.N.Y.1991) (citing *H.J. Inc.*). *See also Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.) (en banc), *vacated and remanded*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989) ("our analysis of relatedness and continuity has shifted from the enterprise element to the pattern element.").

■ The Supreme Court in *H.J. Inc.* explained that "Congress was concerned in RICO with long term criminal activity," 492 U.S. at 242, 109 S.Ct. at 2902, and that continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that *by its nature* projects into the future, with a threat of repetition" which extends "indefinitely into the future," *id.* (emphasis added); *see Beauford*, 865 F.2d at 1391 ("Congress's goal in fashioning its definition of 'pattern of racketeering activity' was to exclude from the reach of RICO criminal acts that were merely 'isolated' or 'sporadic' " in nature). This Court in *Passini v. Falke–Gruppe*, 745 F.Supp. 991, 992 (S.D.N.Y.1990) identified the factors for assessing continuity or the threat of continuity in a RICO claim. Those factors include the number and variety of predicate acts, the length of time during which they were committed, the number of victims and the occurrence of distinct injuries. *See id.* (citing *Continental Realty Corp. v. J.C. Penney Co.*, 729 F.Supp. 1452, 1454 (S.D.N.Y. 1990)).

Plaintiff alleges that "[t]he pattern of racketeering activity ... was engaged in by the RICO defendants ... by the sale of the ABN archives through a series of frauds *aimed at plaintiff and other buy-* ers of portions of the ABN archives," Am. Compl. ¶ 52 (emphasis added), during the period "February, 1990 ... through at least September, 1991," *id.* ¶ 51. Plaintiff further alleges that the pattern in which the RICO defendants engaged "threatens to continue today." *Id.* In support of his allegations, Plaintiff points to, among other acts, the mailing of Lamb's alleged misrepresentations in an interview in the *Bank Reporter* regarding the means by which the archival material would be sold to the public; the dissemination of the alleged misrepresentation contained in the catalogue for the November sale that all existing ABN archival material owned by USBN would be sold at the November auction and that no further impressions of these materials would be made from ABN plates; the implied warranty contained in the catalogue for the November sale that USBN owned the material to be auctioned; and the insertion of a misrepresentation in an addendum to the November catalogue regarding the private sale of banknotes to the Bank of Canada. Plaintiff contends that these representations were false because at the June auction there was duplication of material sold at the November auction.

Plaintiff further maintains that the proposed amended complaint shows that Defendants worked "in unison through complex means toward one common fraudulent goal," Pl.'s Reply Mem. at 11, in part because USBN did not own some of the archival material offered for sale—namely, the Canadian materials withdrawn from sale and banknotes allegedly owned by the Bank of Israel and other foreign governments. Plaintiff claims he was defrauded at the November auction due to USBN's failure to acknowledge its lack of ownership of the archival materials being sold by it, and charges that the foreign governments involved were the true owners. Second, Plaintiff claims that the sales in June and September included materials not owned by USBN but owned by foreign governments. Plaintiff's proposed amended complaint, however, does not allege fraud with regard to the June and Septem-

ber sales of materials owned by these governments.[1]

The RICO claim in essence is a claim that Plaintiff and other buyers at the November auction were defrauded when Defendants misrepresented that duplicates of the items sold did not exist and would not be sold, when in fact such duplicates existed and were sold by Defendants in June 1991 and by USBN in September 1991.[2] The RICO claim asserts that these sales of duplicates caused injury to Plaintiff and other buyers due to their purchases at the November auction. Thus the claim is based on the November auction and the representations made prior to that auction. This is too short a time to constitute a pattern of continuing criminal activity. *See Continental,* 729 F.Supp. at 1455; *Mead v. Schaub,* 757 F.Supp. 319, 323 (S.D.N.Y.1991) (defendant's acts occurring over a five year period held insufficient to satisfy continuity requirement where scheme had terminable nature and single goal).

Furthermore, Plaintiff's reply brief and the amended complaint themselves suggest that Defendants' actions were "narrowly directed toward a single allegedly fraudulent goal," *see Continental,* 729 F.Supp. at 1455, namely, to sell ABN archival material. The June 1991 expiration date of the contract between Christie's and USBN to auction the ABN archival material at issue, and the lack of any allegations concerning Christie's thereafter, demonstrate that the association between USBN and Christie's as charged terminated, and Defendants did not "function as a continuing unit" to defraud purchasers of banknotes after June 1991. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524,

2528, 69 L.Ed.2d 246 (1981). The objective of these Defendants was too limited to constitute a pattern of *continuing* fraud.

In sum, the proposed amended complaint lacks sufficient allegations of continuity and activity of a criminal nature necessary to establish a pattern of racketeering activity. *United States v. Indelicato,* 865 F.2d 1370, 1381–82 (2d Cir.), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24, 25 (1989). Defendants' past conduct does not constitute the type of "long-term criminal activity" envisioned by the Supreme Court in *H.J. Inc.* when it described a closed-ended concept. 492 U.S. at 242, 109 S.Ct. at 2902. The scheme alleged by Plaintiff had a limited goal, *i.e.,* the sale of the ABN archives, and the alleged misrepresentations upon which purchasers relied took place prior to the November-auction and over too limited a period of time—less than one year—to constitute a pattern of continuing criminal activity. *See Continental,* 729 F.Supp. at 1455; *Mead,* 757 F.Supp. at 323.

Nor do the actions of Defendants suggest "a distinct threat of long-term racketeering activity" that "by its nature projects into the future, with a threat of repetition"—the open-ended concept of criminal activity described in *H.J. Inc.,* 492 U.S. at 241, 242, 109 S.Ct. at 2902; *see Continental,* 729 F.Supp. at 1455. Specifically, in his proposed RICO claim, Plaintiff points to USBN's registration statement as evidence of a continuing threat. Specifically, Plaintiff's claim of a threat of continuing violation is based on the following allegations contained in his amended complaint: (1) USBN still possesses ABN archival material and may sell it in the future (¶ 93); (2) USBN's registration statement

---

1. The proposed amended complaint contains no allegation that Defendants knowingly and intentionally sold property which they were not authorized to sell. *See* Am.Compl. ¶¶ 84–85, 89. Indeed, the Bank of Israel allegedly arranged the withdrawal of some items from the June catalogue but not other items. *Id.* ¶ 84. In any event, although USBN's sales in June and September 1991 of banknotes allegedly owned by foreign governments may have injured such governments, Plaintiff alleges the "pattern" of the fraud was aimed only at "buyers" of those

materials. *Id.* ¶ 52. Thus Defendants' alleged activities in June and September, affecting only foreign governments, were not part of the "pattern" alleged by Plaintiff.

2. Plaintiff also claims that Defendants represented that all the ABN archives would be sold at the November 1990 sale, and that the other sales alleged were in violation of this representation. Am.Compl. ¶¶ 57, 63, 91.

stated that USBN "may sell its other remaining material from its archives...." (¶ 92); (3) as a result of the statement contained in the registration statement, Plaintiff concludes that USBN intends to make impressions of the previously sold archival materials from plates contained in the ABN archives. (¶ 94). The registration statement itself, however, refers only to sale of the company's "other remaining materials from its archives." Am.Compl. ¶ 92. It does not state that USBN plans to print for resale facsimiles of ABN materials or any previously sold materials. In short, the registration statement "only provides the opportunity for future fraud, but does not provide any evidence of its likelihood." *Continental*, 729 F.Supp. at 1455. Such "allegations of future opportunities to commit fraud," based on the registration statement, "are not sufficient to support a finding of continuity or threat of continuity." *Id.*

Finally, nothing in Plaintiff's allegations suggests that Defendants' acts are a regular way of conducting Defendants' ongoing legitimate business. *See H.J. Inc.*, 492 U.S. at 242–43, 109 S.Ct. at 2902; *Clapp v. Greene*, 743 F.Supp. 273, 278 (S.D.N.Y. 1990); *Mead*, 757 F.Supp. at 323 ("There is nothing to suggest that the enterprise ... is in the business of or depends on the commission of acts of mail and wire fraud by its employees in the conduct of its day to day affairs."). Plaintiff's RICO claim includes no factual allegations from which one might infer that, after the November auction, Defendants committed the same alleged mail and wire fraud. Accordingly, Plaintiff's motion to amend the complaint to add a RICO claim is denied.

Because Plaintiff's motion to add Lamb, Pope and Kreitman as named individual defendants is based on their participation in the RICO violation alleged in the proposed fourth cause of action, Plaintiff's motion to add these individual defendants is denied.

*Punitive Damages*

▇▇▇▇ Plaintiff also moves to amend his complaint to add a punitive damages claim. Defendants do not contend that the motion to add the punitive damages claim was made in bad faith or after undue delay. This Court, therefore, need only address whether the proposed claim as pleaded presents a colorable ground for punitive damages.

A claim for punitive damages is viable where the complaint alleges that the "wrong is aggravated by recklessness or willfulness, whether or not directed against the public generally." *Roy Export Co. Establishment v. CBS Inc.*, 672 F.2d 1095, 1106 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). *See also Ostano Commerzanstalt v. Telewide Systems, Inc.*, 880 F.2d 642, 649 (2d Cir. 1989) ("punitive damages may be awarded when fraud is gross, wanton, or willful, whether or not directed at the public generally."). In paragraph 40 of the proposed amended complaint, Plaintiff states that the alleged misrepresentations at issue (concerning duplication of banknotes sold at the November auction) "were false at the time when made, and Christie either knew that they were false or was recklessly indifferent to their falsity." Am.Compl. ¶ 40.

Because the proposed amended complaint alleges that Christie's fraud was either willfully or recklessly committed, Plaintiff's motion to add a punitive damages claim to the complaint is granted.

### CONCLUSION

For the reasons set forth above, Plaintiff's motion to amend the complaint to add a RICO claim is denied. Plaintiff's motion to add Lamb, Pope and Kreitman as individual defendants is denied. Plaintiff's motion to amend the complaint to add a claim for punitive damages is granted.

All counsel are to attend a pretrial conference on October 27, 1992 at 9:00 a.m. in courtroom 302.

IT IS SO ORDERED.