**Michael F. CAHILL, Jr., Richard C. Morse, Jr., and Salvatore F. Valvo, Plaintiffs,**

v.

**James D. O'DONNELL, individually, James W. McCormack, individually, N. Nancy Poulin, individually, Robert L. Welsh, individually, James A. Fitzgerald, individually, James McMahon, individually, and Glenn Valle, individually, Defendants.**

No. 97 Civ 4420(BDP).

United States District Court, S.D. New York.

May 21, 1998.

Craig Dickenson, Lovett & Gould, White Plains, NY, for plaintiff.

Gary Silverman, O'Dwyer & Bernstein, New York, NY, for defendant O'Donnell.

John B. Harris, Paul Schectman, Stillman & Friedman, P.C., New York City, for defendants McMahon, Poulin, Fitzgerald and Valle.

Paul M. Collins, Hinman, Straub, Pigors & Manning, P.C., Albany, NY, for defendant McCormack.

Andrew A. Rubin, Mancuso, Rubin & Fufidio, White Plains, NY, for defendant Welsh.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

### INTRODUCTION

The plaintiffs commenced this action, pursuant to 42 U.S.C. §§ 1983 and 1985, claiming deprivation of their First Amendment rights of speech, association,[1] and to petition government.[2] The plaintiffs and the defendants are each current or former members of the New York State Police (the "State Police"). During the events giving rise to this action, the plaintiffs worked in the Internal Affairs Division ("Internal Affairs"), which is charged with investigating corruption, misconduct, and other matters within the State Police. Plaintiffs' central claim is that the defendants, some of whom were also members of Internal Affairs, retaliated against them for their opposition to, and investigation of, corruption within the State Police.

The defendants have each moved to dismiss the complaint under Fed .R.Civ.P. 12(b)(6) or for summary judgement under Fed.R.Civ.P. 56,[3] and have asserted the affirmative defense of qualified immunity. For the reasons that follow, the defendants' motions are granted in part and denied in part.

### BACKGROUND

A district court's function on a motion to dismiss under Fed.R.Civ.P. Rule 12(b)(6) is to assess the legal sufficiency of the complaint. *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir.1991). The Court's "consideration is limited to the factual allegations [of the complaint,] to documents attached to the complaint as exhibits or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Fruchter v. Sossei*, No. 94 Civ. 8586(LBS), 1996 WL 640896, *6 (S.D.N.Y. Nov.4, 1996) (quoting *Brass v. American Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

The issue "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the

---

1. Although the complaint states that plaintiffs assert a claim for infringement of their First Amendment rights to freedom of association, plaintiffs do not allege facts sufficient to support a freedom of association claim. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617–620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1994) (describing the right to associate for First Amendment activities).

2. Plaintiff Valvo has also asserted a due process claim in connection with an alleged constructive discharge.

3. Due to the minimal amount of discovery that has occurred and the early stage of the litigation, the Court treats this motion solely as one to dismiss the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The complaint should not be dismissed unless it appears "beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ricciuti v. NYC Transit Authority*, 941 F.2d 119, 123 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted)). Consequently, the Court accepts as true and construes favorably to the plaintiff the factual allegations in the complaint and supporting documentation. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Walker v. New York*, 974 F.2d 293, 298 (2d Cir.1992); *Wolff v. City of New York Financial Servs. Agency*, 939 F.Supp. 258, 263 (S.D.N.Y.1996). The following facts have been construed accordingly.

This matter arises principally from two investigations in which the plaintiffs participated as members of Internal Affairs. The first investigation concerned an alleged cover-up by members of Troop K of the State Police of an attempted vehicular homicide in Peekskill, New York. The second investigation concerned allegations of excessive force and other misconduct by members of Troop D who responded to a tax protest at the Onondaga Nation American Indian Reservation. The plaintiffs allege that in retaliation for their participation in these two investigations, they were, among other things, punitively denied transfers, stripped of responsibilities, and falsely accused of civil rights violations and gender discrimination.

*Peekskill Hit–and–Run Incident*

In September 1994, defendant James McMahon, the Superintendent of the State Police, received an anonymous tip that certain Troopers assigned to Troop K had attempted to cover-up the fact that in a purported hit-and-run accident in Peekskill a brother of a Trooper had, in fact, attempted to kill another motorist. Members of Internal Affairs, the plaintiffs among them, were assigned to investigate the informant's allegations. In the course of the investigation, the district attorney's office secured a wire tap order to monitor the telephone conversations of Rory Knapp, the brother of the Trooper and the motorist suspected of the attempted homicide.

By December 1994, the investigation had identified three members of the State Police likely to have committed criminal wrongdoing in connection with the alleged hit-and-run accident: Sergeant Robert Welsh (a defendant in this matter) and Peekskill Station Commander Thomas Cerrone and Trooper Robert Gregory (not named as defendants in this action). In January 1995, Cerrone was interviewed by the plaintiffs and an assistant district attorney. Cerrone admitted that the hit-and-run report had been falsified but refused to cooperate further, even after he was granted immunity from criminal prosecution.

The propriety of the "interview" of Cerrone was disputed. While driving home, Cerrone was stopped and escorted to a hotel, where he was interviewed for several hours without counsel present. On February 23, 1995, Cerrone, with the support of the Policeman's Benevolent Association ("PBA"), of which defendant McCormack was the president, filed a lawsuit against seven members of Internal Affairs, including each of the plaintiffs, alleging that they had violated his constitutional rights by stopping and interrogating him without probable cause. Plaintiffs Cahill, Morse, and Valvo allege that the purpose of the lawsuit was to "chill" their opposition to and investigation of corruption within the State Police. In a further effort allegedly to chill the plaintiffs' investigation of corruption, defendant McMahon suggested during in-service training classes that certain defendants in the *Cerrone* suit, including the plaintiffs in this matter, might be indicted in connection with their interrogation of Cerrone. The PBA, under McCormack's direction, did not provide funding to the *Cerrone* defendants for the retention of counsel. In addition, several issues of the PBA newsletter contained references to the *Cerrone* litigation that were supportive of Cerrone and critical of the Internal Affairs members named as defendants in that suit.

In April 1995, Welsh, Gregory, and Knapp were arrested and charged with crimes related to the alleged hit-and-run accident and the subsequent cover-up. None of the three was exonerated. Welsh pleaded guilty to

criminal misconduct and agreed to retire from the State Police. Knapp pleaded guilty to criminal charges and received a one year jail sentence. Gregory pleaded guilty to administrative charges, and the criminal charges against him were dismissed.

Some members of Internal Affairs urged that charges be filed against Cerrone as well. The District Attorney declined to do so, but administrative charges were filed against Cerrone. An administrative hearing was held in November 1996, at which twenty-six witnesses testified. The Hearing Board found Cerrone guilty of one charge and recommended minimal punishment involving censure, a ninety-day probation, and the loss of five vacation days. McMahon, as Superintendent of the State Police, censured Cerrone, and placed him on ninety-day probation, but declined to impose the loss of five vacation days.

*Onondaga Nation Tax Protest*

The second investigation examined the conduct of members of Troop D at a tax protest demonstration that occurred on May 18, 1997 at the Onondaga Nation, an American Indian reservation. A melee developed in which both Troopers and protesters were injured. On May 21, 1997 defendant Fitzgerald, who had become the Chief Inspector of the State Police and the director of Internal Affairs in April 1996, directed plaintiff Valvo to investigate numerous civilian complaints concerning false arrest and the use of excessive force. A few days later, Fitzgerald, received notification from defendant O'Donnell, a Lieutenant Colonel and member of Internal Affairs, that Valvo's investigative technique was unduly confrontational and might impede the investigation. Fitzgerald ordered Valvo to cease all interviews, and then removed Valvo as head of the investigation.

*Additional Retaliatory Conduct*

In addition to his removal as head of the Onondaga Nation investigation, Valvo alleges that as a result of his efforts to oppose corruption within the State Police, Fitzgerald assigned Valvo duties more appropriately delegated to junior personnel and kept Valvo "out of the information loop with respect to major investigations." Valvo also alleges that Fitzgerald directed Valvo's subordinates to withhold information from him. Additionally, Valvo contends that as a result of his refusal to countenance corruption within the State Police, McMahon repeatedly passed him over for promotions to which Valvo was entitled.

Subsequent to the Onondaga investigation and after the filing of the complaint in this action, Superintendent McMahon reassigned Valvo, based in part on Fitzgerald's recommendation that Valvo be transferred due to tensions within Internal Affairs as a result of Valvo's claims in this lawsuit. After receiving a legal memorandum from defendant Valle, the in-house counsel for the State Police, advising that Valvo could be lawfully transferred, McMahon assigned Valvo to the newly created position of Staff Inspector Central Records Administration, effective July 1997. Although the transfer resulted in no reduction in salary or benefits, Valvo viewed his new duties as minimal and demeaning and decided to retire on the first day of the reassignment. The position, which had been created especially for Valvo, was not filled after he retired.

Additionally, plaintiffs allege that Cahill was retaliated against by being reassigned and later by being denied a requested transfer. In the Spring of 1995, Cahill expressed his views to McMahon about corruption within the State Police, concerns to which McMahon, in Cahill's view, provided no "meaningful response." As a result, and based on his belief that the State Police and McMahon were not fully committed to ferreting out internal corruption, Cahill requested a transfer out of Internal Affairs. In 1996, McMahon transferred Cahill to a position outside of Internal Affairs that entailed a decrease in pay of approximately $12,000 a year. Plaintiffs allege that on another occasion defendant McMahon retaliated against Cahill by denying him a requested transfer to another Zone and awarding the transfer to an officer with less seniority than Cahill.

The plaintiffs allege that defendant Poulin, a Sergeant, knowingly filed a false charge of gender discrimination against Cahill in March 1997, at the urging of defendants

McMahon and O'Donnell and in an effort to retaliate against Cahill for his investigation of corruption within the State Police. In essence, Sergeant Poulin claimed that Cahill, on numerous occasions had embarrassed Poulin or unfairly burdened her with responsibilities or blame on account of her gender. After Cahill declined to participate in an informal mediation process, a formal investigation was launched, during which thirty-four witnesses were interviewed. Defendant O'Donnell, who conducted the investigation, issued in a forty-nine page report dated June 16, 1997, in which he concluded that the allegations of gender discrimination were unfounded. The findings of the report were accepted by Fitzgerald, as the head of Internal Affairs, and the matter was closed.

Certain of the defendants are clearly peripheral, at best, to plaintiffs' viable claims. The only conduct challenged on the part of defendant Poulin, for example, is that she filed a claim of gender discrimination against Cahill. Likewise, plaintiffs seek to hold Valle liable for only two actions: the research and writing of the legal memorandum on the basis of which Valvo was transferred and a public statement in which he criticized the lawsuit and questioned whether the plaintiffs would be able "to continue working with the people they may be suing." Finally, the primary claims against Welsh are presumably that he supported the *Cerrone* lawsuit and attempted to cover-up the hit-and-run accident.

## DISCUSSION

*Section 1985 Conspiracy*

■ Plaintiffs claim that the defendants conspired to violate their rights in violation of Section 1985. 42 U.S.C. § 1985(3) provides that it shall be unlawful for "two or more persons [to conspire] for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." In order to state a claim under § 1985(3), a plaintiff must establish "(1) a conspiracy, (2) motivated by racial or other invidiously discriminatory animus, (3) for the purpose of depriving any person or a class of persons of equal

protection or privileges and immunities under the law, (4) that the conspirators committed some act in furtherance of the conspiracy, and (5) that the plaintiffs were injured." *Wintz v. Port Authority of New York and New Jersey,* 551 F.Supp. 1323, 1325 (S.D.N.Y.1982); *see also United Brotherhood of Carpenters Local 610 v. Scott,* 463 U.S. 825, 835–837, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (class-based animus required for § 1985(3) claim); *Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir.1996) (same); *Aulson v. Blanchard,* 83 F.3d 1 (1st Cir.1996) (same).

■ In this case, the plaintiffs have not alleged any facts that could support a finding that racial or other class-based animus motivated any of defendants' conduct. Quite the contrary, the thrust of plaintiffs' argument is that they were retaliated against due to their efforts to oppose corruption within the State Police. Plaintiffs are not a class for § 1985(3) purposes by virtue of having jointly opposed corruption within the State Police. *See United Brotherhood of Carpenters,* 463 U.S. at 837–838, 103 S.Ct. 3352 (common economic views, status, or activities not a basis for class under § 1985(3)); *Graham v. Henderson,* 89 F.3d at 82 (opposition to workplace policies not a basis for § 1985(3) class); *Aulson v. Blanchard,* 83 F.3d at 5 (class must be more than individuals who jointly engage in conduct defendant disfavors). Therefore, plaintiffs have not stated a § 1985 claim and that claim is dismissed.

*Section 1983*

■ To state a claim for a constitutional violation under § 1983, the plaintiff must allege specific facts sufficient to support a finding of a deprivation of rights by defendants who acted "under color of law." *Davidson v. Mann,* 129 F.3d 700 (2d Cir.1997). "[A]llegations which are nothing more than broad, simple, conclusory statements are insufficient to state a claim under § 1983." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) (citing *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir.1976); *Fine v. City of New York,* 529 F.2d 70, 73 (2d Cir.1975)). "A claim of retaliation that is 'wholly conclusory' can be dismissed on the pleadings alone." *Graham*

*v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir .1983)).

▮▮▮ A public employee acts under color of state law for § 1983 purposes "while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins,* 487 U.S. 42, 50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted). Additionally, "a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins,* 487 U.S. at 49–50, 108 S.Ct. 2250.

▮▮▮ However, not every action taken by a state employee is under color of law. *See Pitchell v. Callan,* 13 F.3d 545, 548 (2d Cir. 1994); *Bonsignore v. City of New York,* 683 F.2d 635, 638–39 (2d Cir.1982). Conduct unsupported by the authority of the individual's position as a state employee is not taken under color of law. *Pitchell v. Callan,* 13 F.3d 545, 548 (2d Cir.1994); *Bonsignore v. City of New York,* 683 F.2d 635, 638–39 (2d Cir.1982). Thus, a § 1983 claim fails if the defendant's conduct does not rely on, or is not taken in furtherance of, authority derived from the defendant's role as a public employee. *See Pitchell v. Callan,* 13 F.3d at 548.

▮▮▮ In this case, certain of the acts of which plaintiffs complain, for example, the filing of the Cerrone lawsuit, were not taken under color of law, as required by § 1983. Based on the allegations in the complaint, Cerrone initiated a civil rights lawsuit as might any private individual who believed that his constitutional rights had been violated. Therefore, the Cerrone lawsuit cannot support a § 1983 claim for infringement of constitutional rights. Although plaintiffs allege that defendant Welsh, among others, instigated the Cerrone lawsuit, those allegations do not establish a § 1983 claim because the lawsuit itself was not alleged to have been initiated or prosecuted on the basis of any actual or apparent state authority.

▮▮▮ Similarly, the filing of Poulin's charge of gender discrimination was not conduct under color of law. Poulin filed a grievance alleging that she had been discriminated against by Cahill on account of gender.

The mere fact that Poulin was a state actor does not transform her private complaint into action taken under the color of law for § 1983 purposes. The fact that the charges were ultimately not substantiated and that plaintiffs allege that the charges were "patently false" does not alter this analysis. Accordingly, the claims against Poulin are dismissed.

▮▮▮ The investigation of the complaint by the State Police, on the other hand, does involve conduct under color of law for § 1983 purposes. The plaintiffs allege that O'Donnell, McMahon, and others used their positions to further what they knew to be baseless charges of gender discrimination for the purpose of retaliating against Cahill. Thus, the plaintiffs have stated a claim under § 1983. Similarly, McCormack's decision as president of the PBA to deny funding to plaintiffs to defend against the *Cerrone* lawsuit may represent conduct under color of law.

### First Amendment

The plaintiffs contend that they were retaliated against for exercising their First Amendment rights. Cahill was allegedly subject to two retaliatory employment actions: his 1996 transfer to Troop F and his failure to receive a transfer from one zone to another within Troop F in 1997. Valvo alleges that he was "kept out of the loop" with respect to on-going investigations, was removed as the lead investigator of the tax protest investigation, and was transferred as a result of his initiating this lawsuit.

▮▮▮ In order to establish a First Amendment violation, the employee must establish first that he was engaged in protected First Amendment conduct or that his speech involved a matter of public concern, *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.1993), and second that the protected conduct or speech was "at least a substantial or motivating factor in the employer's adverse employment action." *Ezekwo v. New York City Health & Hosps. Corp.,* 940 F.2d 775, 780 (2d Cir.1991).

Government employers typically may not take adverse action against employees for

exercising their First Amendment rights. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). However, the government employer does have "a legitimate interest in regulating the speech of its employees that differs significantly from its interest in regulating the speech of people in general." *Piesco v. City of New York,* 933 F.2d 1149, 1155 (2d Cir.1991) (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731). An employee's First Amendment rights must be balanced against the government employer's interest in promoting the efficiency of the workplace. *Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1058 (2d Cir.1993).

■■■ Even if the employer does take adverse employment action against the employee, the action may be justified if the employee's speech had "the potential to disrupt the work environment." *Sheppard v. Beerman,* 94 F.3d 823, 827 (2d Cir.1996). An adverse employment action, including termination, will not violate an employee's First Amendment rights if the employer's prediction of disruption is reasonable, the potential disruptiveness outweighs the value of the speech, and the employer took action against the employee based on the likelihood of disruption and not in retaliation for the speech. *Sheppard v. Beerman,* 94 F.3d 823, 827 (2d Cir.1996).

■■■ Whether an employee's speech addresses a matter of public concern must be "determined by [its] content, form and context." *Connick,* 461 U.S. at 147–148, 103 S.Ct. 1684; *Ezekwo,* 940 F.2d at 781. Speech will be characterized as implicating a matter of public concern if it relates to "any matter of political, social or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. In contrast, issues of merely personal importance to the employee are not matters of public concern. *Connick,* 461 U.S. at 149, 103 S.Ct. 1684.

■■■ The First Amendment activities of Valvo and Cahill in investigating corruption within the State Police relate to a matter of public concern. Both the investigations addressed instances of purported police misconduct in which civilians were or could have been harmed. The possibility of widespread police corruption as alleged in this case is a matter of political and social concern to the community. *See, e.g., Bernheim v. Litt,* 79 F.3d 318, 325 (2d Cir.1996) (statements by school teacher regarding quality of education in school district held to be a matter of public concern); *Vasbinder v. Ambach,* 926 F.2d 1333, 1341 (2d Cir.1991) (allegation of fraudulent overbilling in federally funded program held to be a matter of public concern); *Rookard v. Health and Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir.1983) (nurse's allegations of corrupt and wasteful practices at municipal hospital held to be speech on a matter of public concern). The fact that they did not publicize their allegations does not remove their actions from First Amendment protection. *Ezekwo v. New York City Health and Hospitals Corp.,* 940 F.2d 775, 781 (2d Cir. 1991); *Rookard v. Health and Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir.1983). Nor does the fact that Cahill and Valvo had a personal stake in investigating corruption within the State Police remove their First Amendment activities from the realm of public concern. *See Wise v. New York City Police Department,* 928 F.Supp. 355, 372 (S.D.N.Y.1996) (speech regarding sexual harassment in police department held to be a matter of public concern); *Poulsen v. City of North Tonawanda, New York,* 811 F.Supp. 884, 894 (W.D.N.Y.1993) (police woman's allegations of sexual harassment held to constitute speech on a matter of public concern). Therefore, Valvo's and Cahill's conduct in connection with the two investigations comprised First Amendment protected activity.

■■■ Cahill and Valvo have also alleged facts sufficient to establish a claim that the retaliatory conduct of which they complained satisfied the adverse employment standard. The claimed adverse employment action must relate to a significant aspect of the employment relationship. *Rutan v. Republican Party,* 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Even a transfer that entails no loss of pay or benefits may

constitute an adverse employment action. *Rodriguez v. Board of Education,* 620 F.2d 362, 366 (2d Cir.1980). Therefore, both Cahill's transfer and Valvo's reassignment may be adverse employment actions.[4] The other retaliatory conduct of which Valvo complains (e.g. being kept out of the loop) may also amount, in the aggregate, to adverse employment action.

The defendants contend that the transfer of Valvo could not give rise to a constitutional violation because he was transferred due to the disruptive impact of his First Amendment protected activities on Internal Affairs. Although the defendants are correct that the First Amendment rights of the employee must be balanced against the interests of the employer in promoting workplace efficiency, *Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1058 (2d Cir.1993), this 12(b)(6) motion is not the proper means of making that determination. The Court cannot at this time determine whether the transfer of Valvo was justified due to the possibility of disruption. The Court finds that Valvo and Cahill have each stated facts sufficient to support an inference of a retaliatory adverse employment action in violation of their First Amendment rights.

*Qualified Immunity*

The doctrine of qualified immunity entitles public officers to be shielded from liability for damages unless their conduct violates clearly established constitutional rights of which a reasonable person would have known, *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Weyant v. Okst,* 101 F.3d 845, 857 (2d Cir. 1996); *Lennon v. Miller,* 66 F.3d 416 (2d Cir.1995); *Zavaro v. Coughlin,* 970 F.2d 1148, 1153 (2d Cir.1992); *Kaminsky v.*

*Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991), or unless it was objectively unreasonable for them to believe that their acts did not violate those rights. *Anderson v. Creighton,* 483 U.S. 635, 638–639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Velardi v. Walsh,* 40 F.3d 569, 573 (2d Cir.1994).

The right alleged to have been violated must be clearly established at a level of specificity such that "a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. To be deprived of the defense of qualified immunity, the violation of plaintiff's rights must be so clear that no reasonable public official could have believed that his actions did not violate plaintiff's rights. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

With respect to each defendant, the qualified immunity claim is to be evaluated, of course, solely on the basis of that defendant's conduct. Defendant Valle is entitled to qualified immunity. As house counsel for the State Police, Valle's only substantial involvement in Valvo's transfer was to write a memorandum in which he concluded that First Amendment law permitted the transfer.[5] However accurate the conclusions Valle reached, he cannot be exposed to liability for damages on the basis of a legal memorandum. A competent public official could reasonably believe that his submission of such a memorandum at the request of a superior would not expose him to liability for a constitutional violation.

McMahon, on the other hand, is not entitled to qualified immunity for Valvo's transfer. If, as plaintiffs assert, McMahon intended to, and in fact did, transfer Valvo, a senior member of Internal Affairs with 27 years experience, to a file clerk position in

---

**4.** Whether the failure to transfer Cahill satisfies the adverse employment action standard is uncertain. There is no allegation that the requested transfer was for anything other than a position involving the same salary, title, and duties. *See McKenney v. New York City Off–Track Betting Corp.,* 903 F.Supp. 619, 623 (S.D.N.Y.1995) (transfer from one department to another with no change in salary, duties, or title does not constitute adverse employment action).

**5.** The plaintiff notes that Valle also publicly criticized plaintiffs' filing of this lawsuit and stated that "We'll have to examine whether or not the [plaintiffs should] continue working with people they may be suing." Contrary to plaintiffs' assertions, this statement provides no basis for any claims against Valle.

retaliation for his opposition to corruption, then McMahon could not have reasonably believed such conduct would not violate Valvo's First Amendment rights. Although the precise nature of Valvo's reassignment cannot be determined on factual record of this motion, the plaintiffs' allegations are sufficient to support a finding that McMahon could not have reasonably believed the transfer to comport with Valvo's First Amendment rights.[6]

 On the basis of the record as it now stands, Fitzgerald is not entitled to qualified immunity for the allegedly retaliatory actions of which Valvo complains. Based on the factual allegations in the complaint, the Court cannot now conclude that Fitzgerald could have reasonably believed that his actions would not violate Valvo's First Amendment rights. The complaint alleges that Fitzgerald told Valvo's subordinates not to share information with him, assigned Valvo to inappropriate duties and recommended Valvo's transfer to a file clerk position. Accepting the allegations of the complaint as true, the Court cannot conclude at this early stage of the litigation that defendants O'Donnell and McCormack are entitled to qualified immunity.

## CONCLUSION

For the reasons stated, the defendants' motions to dismiss are granted in part and denied in part.[7] Plaintiffs' § 1985 conspiracy claim is dismissed. Defendant Valle is entitled to qualified immunity. Defendants' motions to dismiss plaintiffs § 1983 First Amendment and Due Process claims are denied with respect to defendants O'Donnell, McCormack, Fitzgerald, and McMahon. The motions of defendants Welsh, Poulin, and Valle are granted. The complaint is dis-

---

**6.** The fact that McMahon relied in part on the advice of counsel is, of course, relevant to but not dispositive of the qualified immunity inquiry. *See Lucero v. Hart,* 915 F.2d 1367, 1371 (9th Cir.1990) (defendant's consideration of advice of counsel is relevant but does not conclusively establish that the defendant is entitled to qualified immunity).

**7.** To the extent that the Court's disposition of defendants' motion to dismiss has not mooted them, defendants' motions for summary judg-

missed with prejudice [8] as to defendants Poulin, Valle, and Welsh. The parties are directed to complete discovery by October 16, 1998, to submit pre-trial papers by October 30, 1998, and to appear for a final pre-trial conference on November 6, 1998 at 3:30 p.m.

**SO ORDERED.**

---

ment are denied without prejudice and with leave to renew at the conclusion of discovery.

**8.** The plaintiffs are not granted leave to amend because, given the facts of this case as reflected in the allegations of the complaint, any amendment would be futile. *See Barrett v. United States Banknote Corp.,* 806 F.Supp. 1094, 1098 (S.D.N.Y.1992) (leave to amend should not be granted when the amendment would prove futile).