Loretta COLLINS, Plaintiff,

v.

Donald CHRISTOPHER, Robert Olson, William Cave, Gerald Curtis, Emil Cavorti, Edward Barrette, City of Yonkers, Defendants.

No. 96 Civ 4719 BDP.

United States District Court, S.D. New York.

May 25, 1999.

---

Jonathan Lovett, Lovett & Gould, White Plains, NY, for plaintiff.

Bonnie Mussman, Mussman & Northey, New York City, for defendants.

## MEMORANDUM DECISION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

Plaintiff Loretta Collins, a female police officer with the Yonkers Police Department ("YPD"), brings this action against defendants Donald Christopher, Robert Olson, William Cave, Gerald Curtis, Emil Cavorti, Edward Barrette in their individual and official capacities, and the City of Yonkers ("City"), pursuant to 42 U.S.C. § 1983, alleging violations of her First Amendment rights to free speech and to petition the government for the redress of grievances,[1] and her Fourteenth Amendment right to equal protection, as well as retaliation and hostile environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, et seq. Collins also asserts parallel state law claim under the New York State Human Rights Law, N.Y.Exec. Law § 296, as well as a disability discrimination claim under New York State Human Rights Law, N.Y.Exec.Law § 290, et seq., pursuant to this Court's pendant jurisdiction. *See* 28 U.S.C. § 1367(a).[2]

Before this Court is defendants' motion for summary judgment, pursuant to Fed. R.Civ.P. 56(b). For the reasons stated below, defendants' motion is granted in part and denied in part.

## BACKGROUND

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, "[a]s a general rule, all ambiguities and references to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986)). The following facts are construed accordingly.

In March of 1985, plaintiff Loretta Collins became a police officer in the YPD. Following her rookie year in the 3rd Precinct, Collins served as an officer in the Emergency Services Unit ("ESU") from

---

1. Because right-to-petition claims are subject to the same analysis as speech claims, the two claims will be analyzed jointly. *See White Plains Towing v. Patterson*, 991 F.2d 1049, 1059 (2d Cir.1993) (citing *Wayte v. United States*, 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 1532 n. 11, 84 L.Ed.2d 547 (1985)).

2. The amended complaint mentions but does not detail a claim under 42 U.S.C. § 1985. It appears that plaintiff has abandoned this claim. Collins generally alleges a § 1985 violation in the first paragraph of her amended complaint, but does not indicate which subsection she believes applies. Plaintiffs motion in opposition to defendants' motion for summary judgment does not mention a claim under § 1985.

1986 to 1993 and then in the Inspectional Services Division of the Medical Control Unit ("MCU") from 1993 to 1997. Collins claims that during each of these assignments, she was subjected to ongoing sexual harassment by fellow officers, discrimination by the department, and retaliation against her when she complained about the harassment to YPD officials and ultimately to the United States Equal Employment Opportunity Commission ("EEOC"). Collins claims that among other things, she and other women regularly were called vulgar and derogatory names and that they received inferior assignments compared to their male counterparts. Defendants deny these allegations of discrimination and claim that the alleged derogatory statements were made in jest. In addition, defendants assert that foul language was a regular but harmless part of interactions within the YPD and that Collins herself often participated in the name calling and vulgar joking.

Collins claims that during 1985, her rookie year at the Police Academy, she and other women were subjected to verbal abuse because of their gender. She claims that on two specific occasions, two different male rookies told her that women did not belong on the job, a third officer made similar comments, and all the male members of the training class stated that women were not capable of doing the job but that female officers should be retained for reproductive purposes. Collins says she expressed her concern about these statements to the instructor of the class. When she requested to be assigned to the ESU at the end of her rookie year, Collins says she was told that she wouldn't be assigned there and that "cunts" were not wanted in that unit.

After repeated requests to be placed there, in March of 1986, Collins became the only female officer assigned to ESU. She remained in that unit until May of 1993. Collins says her experience in ESU was marked by harassment. She alleges that male officers in ESU at times referred to her and other women in highly derogatory terms, but she does not name the antagonists. When she first joined ESU, men in the unit outright refused and "went nuts" when told they would ride with Collins, she says. As early as her first day, a rubber chicken with female genitalia drawn on it was hung from the rearview mirror of the ESU truck she was assigned to drive. When ESU moved from the 4th Precinct to a separate building, the unit built a separate locker room for Collins, but later male officers who resented her presence usurped part of that locker room and made it a weight room. Animal parts, including deer's legs, a dead bat and a dead mouse were placed outside of the women's locker room. During this time, plaintiff was also exposed to the male officers in underwear and towels and had to listen to their conversations regarding their sex lives. When using the common bathroom, she was told to "get the fuck out" at least five different times while male officers banged on the door. Collins also observed pornographic magazines and posters in the bathroom. Collins, who was pregnant twice during her assignment to ESU, was told that women only came on the job to get pregnant so they could receive the benefits but not do the job, and was demeaned for being pregnant.

In May of 1993, Collins was transferred to the Inspectional Services Division of the Medical Control Unit ("MCU"). During her tenure in MCU, she asserts that Sergeant Warren Cave (the twin brother of defendant William Cave), Captain Gerald Curtis, and Lieutenant Edward Barrette, among others, routinely called her and other women demeaning names. Collins says that Sgt. Cave was perhaps the worst offender—his derogatory sexual behavior and language continued consistently from 1993 to late 1995 and little was done about it. Sgt. Cave, according to Collins, placed Sesame Street dolls Ernie and Bert on top of his desk and open to public view in a position of anal intercourse. Sgt. Cave and Sgt. Gardner pretended in a highly

offensive fashion to be homosexual lovers in plaintiff's presence on numerous occasions. Sgt. Cave discussed with plaintiff an explicit video of two YPD officers having sex and told her that the male officer in the video "was pounding the shit out of her." This behavior was offensive to Collins who avers that she expressed this belief to everyone in the unit.

Collins complained to her captain about Sgt. Cave but the captain did nothing to resolve or rectify the situation and treated the behavior dismissively. Sgt. Cave's behavior was dismissed as "being on the rag." Collins also told Capt. William Cave about his brother's actions and requested his intervention.

In addition to sexual harassment, Collins had other problems with the YPD during this time. She claims that in 1993 to 1994, Police Commissioner Robert Olson conspired with then Deputy Chief Donald Christopher to stop the lawful arrest of Joseph Celli, a man accused of stalking Collins' sister. Celli was a relative of a YPD detective. In 1994 Collins complained about this investigation, stating that it was "handled funny," meaning that the matter was not properly pursued. She contacted Commissioner Olson and the District Attorney's office and alleged cronyism, favoritism, and protection of an officer's relative from investigation. In response to her complaints, Collins says she was threatened with disciplinary action, skipped over for promotion, and followed by members of the YPD. Her superiors also advised her to retain a lawyer because disciplinary charges would in all likelihood be filed against her.

Collins alleges that the sexual harassment and use of foul language in MCU continued under Captain Gerald Curtis, who was the commanding officer of the Internal Affairs Division ("IAD") and MCU from March 1995 to September 1996. Sgt. Richard Bannetto; Collins alleges, referred to complainants in vulgar and extremely offensive terms. This affected plaintiff in that she felt "guilty" because

the YPD was not helping the complainants and was "embarrassed" because Curtis displayed disrespect for women.

Collins alleges that Curtis had a particular disdain for women. Both he and Sgt. Cave stated to Collins that women should be "kept barefoot and pregnant." Collins told Curtis that this offended her, yet he continually made such remarks. Capt. Curtis told Plaintiff that gassing up a car is a good job for a woman, that if a police car was broken a woman must have been driving it, and that cleaning up vomit was a woman's job. Capt. Curtis referred to women police officers who were absent from work due to injury as "phonies" and "fakers," made them go to the doctor multiple times and had their houses watched. Capt. Curtis told plaintiff she should "diet," that she should run up and down the stairs to lose weight, and when she was eating he would state "don't you think you had enough?"

Collins alleges that she received inferior assignments and training, and that she was undermined in the performance of her duties because she is a woman. Collins claims, *inter alia*, that on patrol in the 3rd Precinct, where she worked during her rookie year, males with less seniority than her were assigned patrol cars while she was assigned to foot posts. In 1992 during her later pregnancy and against her wishes, Collins was assigned to the Records Administration Unit, derisively called the "vegetable bin" within the department, where she had to do mundane work beneath her skill level. She and other women officers did not receive the specialized training that male officers received, a matter which Collins complained about to Police Commissioner Olson. For example, Collins says she requested numerous times to attend auto theft school, hazardous material school and sniper school, but was denied access to such training. In November of 1993, Collins was promoted to Sergeant. Despite her promotions, Collins claims she was not given a take-home department car, although Sgt. Warren Cave,

the supervisor of MCU, and all other male officers had one. In late 1993 and 1994, as Infection Control Officer responsible for health and safety monitoring within the department, Collins discovered Occupational Safety and Health Administration ("OSHA") violations and recommended in a series of memos to Capt. Cave that the department comply with federal regulations. Her recommendations included TB and HIV prevention techniques to improve the health and safety of officers and civilians. She also inspected the city jail and pointed out some health hazards. She says her recommendations were ignored.

Finally, during Capt. Curtis' command of MCU, the Pope visited Yonkers. On the day of the Pope's visit, Collins did not receive a special assignment but was required to work at MCU, her usual post. This occurred despite the fact that the majority of the department was detailed to the Pope and other law enforcement agencies were brought into Yonkers to assist.

On February 22, 1996, plaintiff filed a discrimination complaint against the YPD with the United States Equal Employment Opportunity Commission ("EEOC"), alleging she had been passed over for promotion to Detective Sergeant in the Internal Affairs Division because of her gender. (Collins has since dropped this claim.) In response, Collins says, she suffered acts of retaliation. On March 4, she says her office was stripped bare and she was moved to the fourth floor to a location that had been constructed for use as a jail. Collins alleges that this was a punitive measure in which she was separated from the rest of the internal affairs staff and moved to an unsuitable office. The 4th floor office was windowless, had spidermites, and a dead bird. The bathroom— which Collins had to share with criminal suspects—was unsanitary: the toilet was routinely smeared with feces and urine, and the drinking water was the color of mud. She avers, *inter alia*, that she was deliberately denied necessary office supplies, including a fax machine (which was not replaced when it broke) and a copy machine, and forced to climb a treacherous staircase which aggravated an old injury.

On March 27, 1996, following the relocation of her office, plaintiff filed her second formal complaint—a retaliation charge of discrimination with the EEOC. Over the next several months, plaintiff contends the retaliation against her continued and that she was ostracized by other members of the department. For example in May of 1996, Collins was absent from work because she had aggravated an old injury going up and down the steps between the third and fourth floors. Capt. Curtis ordered Lieut. Barrette and Sgt. Cave to visit Collins at home, the only time he had ever ordered Sgt. Cave to conduct such a visit. In addition, Collins says she was directed to report to Oracle Management where a "treating" physician made out a false report regarding her symptoms, claiming that she had a full range of motion when in fact she did not. A subsequent MRI revealed herniated discs in her neck and back. Beginning in June of 1996, Collins alleges that her MCU telephone was tapped and her telephone conversations while on duty were recorded. She also received threatening and harassing phone calls. In August of 1996 Collins was denied permission to attend physical therapy during her tour of duty.

In September of 1996, when MCU was transferred to the Field Services Division, Collins was absent from work following gall bladder surgery. When she returned to work on December 9, she alleges, *inter alia*, that her job duties were removed and she was assigned menial tasks such as hole punching and paper-clipping documents. At this time, because she suffered from a post-operative condition of cramping and diarrhea, she requested permission to take lunch during the last hour of her shift, in effect leaving an hour earlier without lunch. She made the request to avoid having an embarrassing accident on the job. The commanding officer of MCU ordered Lieut. Emil Cavorti to deny Col-

lins' request because officers assigned to Field Services were not permitted to take their lunch hours at the end of their tours and Collins had access to a woman's room right down the hall. Collins alleges denial of her request to leave early constitutes discrimination based on her disability. Collins alleges such treatment continued into 1997.

## DISCUSSION

■ Sexual harassment in the workplace is actionable under 42 U.S.C. § 1983 as a violation of the Fourteenth Amendment's right to equal protection. *Annis v. County of Westchester*, 36 F.3d 251, 254 (2d Cir.1994); *Gierlinger v. New York State Police*, 15 F.3d 32, 34 (2d Cir.1994); *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 143–44 (2d Cir.1993). Section 1983 liability "can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer." *Gierlinger*, 15 F.3d at 34. Not all sexual harassment equals sex discrimination, but "harassment that transcends coarse, hostile and boorish behavior can rise to the level of a constitutional tort." *Annis*, 36 F.3d at 254.

■ To sustain an equal protection claim of sexual harassment, a plaintiff must show both "sexual harassment" and an "intent" to harass based upon that plaintiff's membership in a particular class of citizens. To determine whether the plaintiff has shown actionable "harassment," the Court may consider the analogous inquiry under Title VII for guidance. *See Boutros v. Canton Regional Transit Auth.*, 997 F.2d 198, 202 (6th Cir.1993); *Cohen v. Litt*, 906 F.Supp. 957, 963–64 (S.D.N.Y.1995). There are two forms of sexual harassment that violate Title VII's prohibitions against workplace inequality: (1) quid pro quo and (2) hostile work envi-

ronment harassment. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304–05 (2d Cir.1995) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986)). In this case, the plaintiff alleges hostile work environment harassment only.

■ Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Tomka*, 66 F.3d at 1305 (internal quotations omitted). In *Harris v. Forklift Sys.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court reaffirmed that to prevail on this type of sexual harassment claim a plaintiff must show that the harassment was " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment.' " *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (quoting *Meritor Sav. Bank*, 477 U.S. at 67, 106 S.Ct. at 2405–06); *Tomka*, 66 F.3d at 1305. The determination of whether there is a hostile or abusive environment in the workplace—from both a reasonable person's standpoint as well as the victim's subjective perception—can only be determined by considering the totality of the circumstances. *Tomka*, 66 F.3d at 1305 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. at 371).

### 1. *CONTINUING VIOLATION*

Defendants' principal argument in support of summary judgment is that many of the events and conduct complained of with regard to plaintiff's claims under 42 U.S.C. § 1983 and under the New York Human Rights Law are barred by the three-year statute of limitations governing such claims. In addition, defendants assert that the 300–day statute of limitations applicable to Title VII claims bars any such claim based on events before April 28, 1995.[3]

---

**3.** Defendants' statute of limitations argument

applies only to plaintiff's hostile work envi-

Title VII requires a claimant to file a discrimination charge with the EEOC within 180 days of the alleged unlawful employment action, or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged act of discrimination. *See* 42 U.S.C. § 2000e–5(e)(1); *Quinn v. Green Tree Credit Corporation,* 159 F.3d 759, 765 (2d Cir.1998). Collins filed her federal lawsuit on June 21, 1996. Defendants note that Paragraphs 11 through 22 of the Amended Complaint relate to events that allegedly occurred in 1985 when Collins was a rookie, and during the period 1986 through April 1993, when she was in ESU. Collins, in turn, asserts that the acts complained of constituted a continuing violation of her civil rights, that a substantial number of incidents occurred within the statute of limitations, and thus that all of her claims are timely.

Because this Court agrees that plaintiff has not alleged facts sufficient to establish a continuing violation, summary judgment is granted on those claims under § 1983, Title VII and the New York Human Rights Law based on events that occurred outside of the statute of limitations.

■ The continuing-violation exception " 'extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations.' " *Quinn,* 159 F.3d at 765 (quoting *Annis,* 136 F.3d at 246). The exception "applies to cases involving specific discriminatory policies or mechanisms such as discriminatory seniority lists, or discriminatory employment tests. However, multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir.1993). "[A] continuing violation

may be found where ... specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). "The courts in this circuit consistently have looked unfavorably on continuing violation arguments. Indeed, only 'compelling circumstances' will warrant application of the exception to the statute of limitations." *Riedinger v. D'Amicantino,* 974 F.Supp. 322, 325 (S.D.N.Y.1997) (quoting *Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989)).

■ In light of the above standards, Collins has failed to make the necessary showing to invoke the continuing violation exception. She has presented no evidence of a "discriminatory policy or mechanism" or an ongoing policy that extended from 1985, when she was a rookie, through her assignments in ESU (1986–1993) and MCU (1993–1997). Many of Collins' allegations of derogatory name calling—highly offensive as they may be—are general in nature and do not identify particular individuals or particular dates. She says, for example, that she was called a "bitch" and a "dyke" while she worked in ESU, but does not say when or by whom. The acts Collins alleges to have occurred outside the limitations periods are not sufficiently connected with one another or with the timely acts that she has alleged. The events that she alleges occurred between 1985 and 1997—a 12–year period—are specific, seemingly unrelated instances of discrimination, *see Lambert,* 10 F.3d at 53, perpetrated by different actors in different divisions of the YPD. Collins has not shown that the alleged events were close enough in time, or otherwise related, to rise to the level of a continuing violation. *See Annis,* 136 F.3d at 246 (discriminatory acts separated by six-year gap cannot be joined as a continuing violation); *Selan v.*

---

ronment claim. Plaintiff's Title VII claim of retaliation is not time-barred. As almost all of the alleged incidents of retaliation occurred

after March of 1996, this latter claim falls well within the statute of limitations.

*Kiley,* 969 F.2d 560, 565–67 (7th Cir.1992) (two-year gap between discriminatory events "negates the contention that the acts were continuous or connected"); *Blesedell,* 708 F.Supp. at 1417–18 (no continuing violation in light of four-year interval between discriminatory incidents); cf. *Cornwell,* 23 F.3d at 704 (a three-year gap would not prevent a finding of continuing violation only because the employee was absent on account of illness). "This discontinuity is fatal to [plaintiff]'s 'continuing violation' argument." *Quinn,* 159 F.3d at 766. For the foregoing reasons, summary judgment is granted on those claims under § 1983 and the New York Human Rights Law based on events that arose outside the statutory limitations period. In addition, the 300-day statute of limitations applicable to Title VII claims bars any such claim based on events before April 28, 1995.

■ Disputed issues of material fact exist as to whether Collins was subject to hostile environment sexual harassment during her tenure in MCU (1993–1997), in violation of Title VII and whether she was denied equal protection under the Fourteenth Amendment for claims arising during that same period. Defendants' motion for summary judgment on these claims based on events arising after June 21, 1993 therefor is denied. Summary judgment also is denied on Collins' parallel state law claims alleging discrimination, retaliation and sexual harassment under the New York State Human Rights Law. The same disputed issues of material fact discussed above support these claims.

### 2. *FIRST AMENDMENT CLAIM*

The plaintiff alleges that she was retaliated against for exercising her First Amendment rights. While it is not entirely clear what speech forms the basis of Collins' First Amendment claim, it appears that the claim is based on several different activities: (1) complaints to the District Attorney's office and to Commissioner Olson in February 1994 regarding the investigation of Joseph Celli, the man accused of stalking Collins' sister; (2) reports made by Collins in her capacity as Infection Control Officer in which she identified violations of health standards and made recommendations on how the department could comply with federal government regulations; (3) her 1996 EEOC complaints and (4) statements made to Capt. Curtis in March of 1995 protesting his treatment of women officers.

■ To establish a First Amendment violation, the employee must establish first that she was engaged in protected First Amendment conduct or that her speech involved a matter of public concern, *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.1993), and second that the protected conduct or speech was "at least a substantial or motivating factor in the employer's adverse employment action." *Ezekwo v. New York City Health & Hosps. Corp.,* 940 F.2d 775, 780 (2d Cir.1991); *Cahill v. O'Donnell,* 7 F.Supp.2d 341, 348 (S.D.N.Y.1998).

■ Government employers typically may not take adverse action against employees for exercising their First Amendment rights. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). However, the government employer does have "a legitimate interest in regulating the speech of its employees that differs significantly from its interest in regulating the speech of people in general." *Piesco v. City of New York,* 933 F.2d 1149, 1155 (2d Cir. 1991) (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731). The public employee's First Amendment right to speak on matters of public concern must be balanced against the government employer's interest in promoting its own efficient operation and the efficient delivery of services to the public. *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987) (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731); *White Plains Towing*

*Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir.1993). "While ... public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691.

 Even if the employer does take adverse employment action against the employee, the action may be justified if the employee's speech had "the potential to disrupt the work environment." *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir.1996). An adverse employment action will not violate an employee's First Amendment rights if the employer's prediction of disruption is reasonable, the potential disruptiveness outweighs the value of the speech, and the employer took action against the employee based on the likelihood of disruption and not in retaliation for the speech. *Sheppard,* 94 F.3d at 827.

 To succeed on a claim that she was disciplined or punished for the exercise of her First Amendment rights, Collins must show: "(1) that the conduct at issue was protected speech; and (2) that the speech played a substantial part in the employer's adverse employment action; i.e., that the adverse action would not have occurred but for the employee's protected actions." *Ezekwo,* 940 F.2d at 780–81. "The threshold question in applying this balancing test is whether [the employee]'s speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Rankin*, 483 U.S. at 384, 107 S.Ct. 2891 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689). The speech at issue must be "fairly considered as relating to any matter of political, social, or other concern to the community" to enjoy special protection. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690. In contrast, issues of merely personal importance to the employee are not matters of public concern. *Connick*, 461 U.S. at 149, 103 S.Ct at 1691. Whether an employee's speech addresses a matter of public concern "must be deter-

mined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684; *Ezekwo,* 940 F.2d at 781; *Cahill,* 7 F.Supp.2d at 349.

In this case, Collins' statements relating to the investigation of Joseph Celli were not speech on a matter of public concern and, therefore do not merit First Amendment protection. Speech encompassing a wide range of issues has been held to constitute speech on a matter of public concern. *See e.g., Bernheim v. Litt,* 79 F.3d 318, 325 (2d Cir.1996) (statements by school teacher regarding quality of education in school district held to be matter of public concern); *Vasbinder v. Ambach,* 926 F.2d 1333, 1341 (2d Cir.1991) (allegation of fraudulent overbilling in federally funded program held to be a matter of public concern); *Rookard v. Health and Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir. 1983) (nurse's allegations of corrupt and wasteful practices at municipal hospital held to be speech on a matter of public concern); *Wise v. New York City Police Department,* 928 F.Supp. 355, 372 (S.D.N.Y.1996) (speech regarding sexual harassment in police department held to be a matter of public concern); *Poulsen v. City of North Tonawanda, New York,* 811 F.Supp. 884, 894 (W.D.N.Y.1993) (police woman's allegations of sexual harassment held to constitute speech on a matter of public concern).

 However, not all speech by government employees in the workplace addresses matters of public concern. *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691. Speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, cannot support a First Amendment claim. *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.1993). For example, a personal desire for a particular work assignment is not a matter of public concern. *White Plains Towing Corp.,* 991

F.2d at 1058 (citing *Connick*, 461 U.S. at 148, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708). Nor are complaints about one's treatment in a professional training program a matter of public concern. *Ezekwo*, 940 F.2d at 781. *See Mishk v. Destefano*, 5 F.Supp.2d 194, 201 (S.D.N.Y.1998). The fundamental question is whether the employee is seeking to vindicate personal interests or bring to light a matter of political, social, or other concern to the community. *Rao v. NYC Health & Hospitals Corp.*, 905 F.Supp. 1236, 1243 (S.D.N.Y.1995). "Even as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight." *White Plains Towing Corp.*, 991 F.2d at 1059.

■ When Collins complained to the Police Commissioner and to the District Attorney's Office about the handling of an investigation of Joseph Celli, a man allegedly stalking her sister, she has not demonstrated that she was addressing other than a personal, internal office affair. Collins was not attempting to call attention to or remedy any pervasive or systemic problem regarding YPD's handling of investigations in general; but rather was questioning the conduct of one specific investigation in which she had a personal stake—her sister's well-being. Her interest was, insofar as she has documented it, limited to her sister's case and did not extend to broader community concerns. *See Ezekwo*, 940 F.2d at 781 ("[Plaintiff]'s statements did not address matters of public concern. Her complaints were personal in nature and generally related to her own situation...."). This conclusion is reinforced by Collins' allegations that her involvement increased as her sister became more and more distraught and turned to Collins for help. Indeed, when she complained to Police Commissioner Olson about the handling of the investigation in February of 1994, Collins described her sister as frightened, "emotionally unglued" and increasingly paranoid. Deposition of Loretta Collins, Vol. III, 50. Collins' statements regarding this investigation did not address a matter of public concern.

■ By contrast, plaintiff's statements made as YPD's Infection Control Officer regarding the department's compliance with OSHA regulations address matters of public concern. The defendants argue that in bringing to light OSHA violations, Collins was merely doing her job as infection control officer and that her speech on these issues should not be protected. This contention is not persuasive. "[T]he fact that the speech arose during plaintiff's usual performance of [her] duties weighs strongly against a characterization of plaintiff's speech as relating to a matter of public concern." *Mishk*, 5 F.Supp.2d at 201. "However, the fact that an employee is speaking in the employee's capacity as an employee in furtherance of official duties does not preclude a finding that the employee is speaking on a matter of public concern." *Rao*, 905 F.Supp. at 1242. Collins' memos urging YPD's compliance with vaccination requirements and other health and safety measures—which affected officers as well as members of the public entering the department—clearly concerned the broader community, not just Collins' particular employment situation.

■ While plaintiff's statements concerning OSHA violations address matters of public concern, they fail to satisfy the second element of the retaliation claim—that the adverse employment action was a direct result of the protected speech. The claimed adverse employment action must relate to a significant aspect of the employment relationship. *Rutan v. Republican Party*, 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). For example, the discharge of an employee is clearly an adverse employment action. *See Connick*, 461 U.S. 138, 103 S.Ct. 1684; *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (employee fired by

constable for political remark made to co-employee during private conversation). Even a transfer that entails no loss of pay or benefits may constitute an adverse employment action. *Rodriguez v. Board of Education,* 620 F.2d 362, 366 (2d Cir.1980). Collins has failed to identify any action taken against her because of her reports as Infection Control Officer. She merely alleges that her recommendations were not followed, but does not demonstrate how this adversely affected her employment status. Because Collins has not adequately demonstrated the existence of adverse employment action against her as a consequence of the OSHA reports, this speech cannot support her First Amendment claim.

■ The defendants contend that Collins' complaints of sexual harassment and discrimination were not entitled to First Amendment protection because they were motivated by and concerned only her particular employment situation and thus did not involve matters of public concern. In this area, disputed issues of material fact exist that cannot be summarily decided. It is clear that if Collins' complaints "implicated system-wide discrimination they would have unquestionably involved a matter of 'public concern.' " *Saulpaugh,* 4 F.3d at 143. A public employee's comments on gender discrimination may, in certain circumstances constitute matters of public concern. *Donahue v. Windsor Locks Bd. Of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Wise,* 928 F.Supp. at 372 (speech regarding sexual harassment in police department held to be a matter of public concern); *Poulsen,* 811 F.Supp. at 894 (police woman's allegations of sexual harassment held to constitute speech on a matter of public concern). If Collins can show that she "wanted to debate issues of sex discrimination, that her suit sought relief against pervasive or systemic misconduct by a public agency or public officials, or that her suit was part of an overall effort ... to correct allegedly unlawful practices or bring them to public atten-tion," *Saulpaugh,* 4 F.3d at 143 (internal quotations omitted), her complaints of sexual harassment are deserving of protection.

Collins has alleged sufficient facts to satisfy the second element of the test for her First Amendment claim—that the speech played a substantial part in the employer's adverse employment action. Material changes in her working conditions in March of 1996 following her February EEOC complaint may be an adverse employment action. The other retaliatory conduct of which collins complains may also amount, in the aggregate, to *de facto* demotions that constitute adverse employment action. *See Cahill,* 7 F.Supp.2d at 350. Whether this is ultimately so must, of course, await trial. However, summary judgment on this claim is similarly denied.

### 3. *TITLE VII RETALIATION CLAIM*

■ Section 704 of Title VII prohibits an employer from "discriminat[ing] against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." § 42 U.S.C.2000e– 3(a). Section 703(a) defines an "unlawful employment practice" as follows:

It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

§ 42 U.S.C. § 2000e–2(a)(1). "To establish a prima facie case of retaliation, an employee must show '(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.' " *Quinn,* 159 F.3d at 769 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995)); see also *Wimmer v. Suffolk County Police*

*Dept.*, 176 F.3d 125, 134 (2d.Cir.1999). Disputed issues of material fact exist as to whether plaintiff was retaliated against in violation of Title VII. Defendants' motion for summary judgment is therefor denied on this claim.

### 4. HRL DISABILITY CLAIM

Defendants move for summary judgment on plaintiff's claim that she was discriminated against because of her disability under the New York Human Rights Law ("HRL"), N.Y.Exec.Law § 290, et seq. Following gall bladder surgery in September of 1996, Collins claims to have suffered from post-operative diarrhea and stomach cramps. Her disability claims is based on the denial of her request to schedule her lunch hour at the end of her shift, allowing her to leave work an hour early, to avoid having an embarrassing accident on the job. Because plaintiff has not shown that she suffered from a disability, summary judgment on this claim is granted.

▮ Collins' disability claim under HRL is subject to the same analysis as claims brought under the Americans with Disabilities Act ("ADA"), which directs that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." § 42 U.S.C. 12112(a). *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867 (2d Cir. 1998) (applying same analysis to plaintiff's claims under the ADA and the HRL); *Johnson v. New York Medical College*, No. 95 Civ. 8413, 1997 WL 580708, at *4 n. 1 (S.D.N.Y. Sept. 18, 1997).

▮ In order to survive a defendant's motion for summary judgment on a disability discrimination claim, the plaintiff must establish a prima facie case of discrimination by producing evidence sufficient to support a reasonable inference of disability discrimination. *See Ryan*, 135 F.3d at 869; *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir.1995); *Daley v. Koch*, 892 F.2d 212, 214 (2d Cir.1989) (discussing disability claim brought pursuant to the Rehabilitation Act). To meet that burden, a plaintiff must show that (1) she is an individual with a "disability" as defined by the ADA, (2) she is otherwise qualified to perform the basic functions of her job, and (3) she was discriminated against because of her disability. *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721 (2d Cir.1994); *Aquinas v. Federal Express Corp.*, 940 F.Supp. 73, 77 (S.D.N.Y.1996).

The ADA defines "disability" as one of three things: (A) a physical or mental impairment that substantially limits one or more of the major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. § 42 U.S.C. 12102(2) (1994); *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 641 (1998). Plaintiff must prove that the disability substantially interferes with "major life activities," defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Colwell*, 158 F.3d at 642. Other major life activities include, but are not limited to "sitting, standing, lifting, or reaching." *Ryan*, 135 F.3d at 870 (quoting U.S. Equal Employment Opportunity Commission, Americans with Disabilities Act Handbook I–27 (1992)).

The EEOC regulations implementing the ADA define the term "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general

population can perform that same major life activity.

§ 29 C.F.R. 1630.2(j)(1); *Colwell*, 158 F.3d at 643. The regulations recommend that the following factors be considered in determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). *See also Ryan*, 135 F.3d at 871–72 (applying factors).

Under the EEOC guidelines, an individual's ability to work is substantially limited (among other indicia) if the plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." § 29 C.F.R. § 1630.2(j)(3)(i). The regulations make clear that "the inability to perform in a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.

■■■ Collins' has failed to demonstrate that her post-operative diarrhea and cramping—though it may have been unpleasant—rose to the level of a disability. Courts in this circuit have declined to find that a condition more severe than the one Collins has described amounted to an impairment that substantially limited a major life activity. *See Ryan*, 135 F.3d at 872; *Johnson*, 1997 WL 580708, at *6. In both cases, the courts declined to find that plaintiffs were disabled where both individuals suffered from colitis, a disease of the rectum which causes diarrhea, stomach cramps, rectal bleeding, lower back pain and other symptoms. *See Ryan*, 135 F.3d at 868; *Johnson*, 1997 WL 580708, at *1. In those cases as here, "Plaintiff has not raised triable issues of fact to suggest that her [impairment] substantially limited her ability to work, or to perform any other major life activity as those terms are de-fined by the ADA. Thus, plaintiff has failed to make a prima facie showing that she is disabled by her [impairment] within the meaning of the ADA." *Johnson*, 1997 WL 580708, at *6. Summary judgment on this claim is granted.

## CONCLUSION

For the reasons stated above, the motion for summary judgment pursuant to Fed.R.Civ.P. Rule 56 is granted in part and denied in part. Summary judgment is granted to defendants on the first, fourth and sixth claims based on events occurring outside of the statute of limitations. Summary judgment is denied on the first, fourth and sixth claims based on events occurring within the statute of limitations. Summary judgment is denied on First Amendment claims two and three based on speech concerning discrimination against and harassment of women in the Yonkers Police Department. Summary judgment is granted on First Amendment claims two and three based on speech regarding OSHA violations and the investigation of Joseph Celli. Finally, summary judgment for the defendants is granted on plaintiff's Eighth claim of disability discrimination.